24-3140CV Loans on Fine Art LLC v E&S Peck ACG Arrangement and out. And I understand we have Mr. Press appearing on behalf of the appellants, is that right? Yes, sir. Okay, Mr. Press, you would like to reserve two minutes for rebuttal, is that right? That's correct, Your Honor. Okay, you may proceed whenever you're ready. Thank you, Your Honor. Okay. May it please the Court, Your Honor, I'm Matthew Press for the appellants in this matter. The system of arbitration codified in the Federal Arbitration Act affords an arbitrator substantial discretion in adjudicating a dispute in fashion and award. However, that discretion is not unlimited. In order for the system to be fair and to be perceived as fair, Your Honor, this and other courts have long held that under Section 10 of the Federal Arbitration Act and Federal common law that there are guardrails to ensure that the process meets certain basic procedural requirements and that an arbitrator doesn't disregard the terms of a contract or well-established law. Thus, Judge Walker of this Court held in Weiss v. Sally May, a case cited in my papers, that an arbitrator who disregarded the clear terms of a general release that was in a settlement agreement, which encompassed the plaintiff's claims, appeared to have manifestly disregarded the law and vacated that case for proceedings below. As the Court explained in Weiss, vacated was warranted because the arbitrator, quote, strayed from interpretation and application of the agreement and effectively dispensed his own brand of industrial justice. And this Court has also said that ---- Well, I think we're familiar with the standards, so why don't you tell us what was the manifest disregard of the law in your view in this case? Okay, Your Honor. As set forth in the papers, there are a couple different ones. I'm going to start with what I consider to be the clearest and most flagrant manifest disregard, and that is of the provision in the waterfall. The waterfall provision in the settlement agreement, Section 1C1, said that in connection with any sale of a painting, the 10 percent of the proceeds would come off the top. And for what purpose? It was called sales expenses, but it was a liquidated number. Instead, the provision did not say that number would be based on actual sales expenses. It just was defined as 10 percent. The arbitrator said because there was no sale here, there were no sale expenses. And, Your Honor, that's ---- So that wasn't disregarding it. It was maybe misapplying it, but it wasn't disregarding it. So, Your Honor, I would argue that you disregarded it because once again, the standard appears to be that there has to be a colorable basis for what the arbitrator does. An arbitrator never identified a colorable basis. The fact is under the ---- for expectation damages under this contract, the arbitrator had to put the parties in the same position as if the contract had been performed. Why isn't it colorable if there's no sale? There are no sale expenses. That's very simple. It's not colorable, Your Honor, because the contract said if you're enforcing the terms of the contract in a hypothetical sale of the painting, which is what this concerned, 10 percent would come off the top. And so for him to say that, well, there wasn't a sale, so there weren't expenses, so I'm not taking it off the top, disregards this scenario that the Court ---- No, I mean, he erred. Maybe he made a mistake. So, Your Honor ---- I don't know that he was disregarding anything. Well, Your Honor, I mean, this was ---- first of all, in my argument to the arbitrator at the time, I raised these points exactly. He was well aware of the position that to ---- that the waterfall provision had to be applied as it was written. And there was ---- to me, this was more than mere error, because he didn't provide a justification. There is no justification. And when the magistrate and my colleague attempted to provide a justification, the justification was that it would have rewarded the breaching party for breaching, but it wouldn't, because what instead happened is there was a windfall where the ---- I'm sorry. I thought the justification, maybe I'm mistaken, was the fact that there wasn't a sale, and therefore, why would you factor in sales expenses? Well, and once again, Your Honor, and I don't want to spend any more time on this unless the Court has more concerns about this, but the simple fact is the hypothetical sale, in a hypothetical sale of the painting, which is what the judge had to consider, there would have been this 10 percent coming off the top. And Gary Greenberg admitted it. It was completely admitted in the preceding below, and it was a disregarded law. The next item, and this is very much akin to the general release that was ignored in the Weiss case, is it was undisputed in this arbitration that the painting was not in good condition, actually wasn't in good condition. It's a fact that the painting was not in good condition. The 2019 appraisal ---- How was that true? I thought the agreement itself was silent in the question. So I'm talking about the factual record, Your Honor. The factual record was that the 2019 appraisal said that the painting was not in good physical condition. It had been transferred from one medium to another. It wasn't in good physical condition. And what happened was that that was undisputed by Mr. Simon, Mr. Peck, Mr. Greenberg, and Mr. Hunter himself agreed that that painting was not in good condition, okay? But the arbitrator expressly stated, and the arbitrator expressly stated to the parties off the record, that the idea of fashioning a remedy based on the actual sales price of the painting, which was 1.8 million at the auction, left him cold. And instead of simply interpreting the contract and letting the chips fall where they may, the arbitrator engaged in the same kind of disingenuous exercise as the arbitrator in the Weiss case. But I didn't think the arbitrator engaged in any exercise at all. He had a valuation from Dr. Hunter that relied on representations from your client that it was in good condition. And that was a basis for the arbitrator to roughly accept the valuation. And, Your Honor. How is that a disregard? Because I think you're still in manifest disregard right now. I am, Your Honor. So what is the provision of the settlement agreement that restricted the way expert testimony and valuation could be accepted? Your Honor, the contract was crystal clear. It made only a representation as to authenticity.  It made no representation.  Stop. Not my question. What was my question? Yes. The question is how the merger clause precluded reliance on any other. Okay. Let me rephrase my question. My question was, what in the settlement agreement limited the mode of valuation that could be accepted by the arbitrator? That is my question. Well, the settlement agreement didn't speak to the mode of valuation by the arbitrator.  So then the question is if the settlement agreement did not speak to the question, how is it that the arbitrator can be said to have manifestly disregarded the law by doing something that you claim is in violation of the settlement agreement? Because you've just accepted that the settlement agreement doesn't speak to the valuation method. It's what it does speak to, Your Honor, is the arbitrator found that in the settlement agreement my client had stipulated to the condition of the painting. But that simply wasn't true. And he relied on that in order to ignore the 2019 appraisal. No, he relied on the valuation by Dr. Hunter and said that Dr. Hunter's valuation was acceptable based on your client's representations about what it was. But it was in good condition. This comes down to accepting Dr. Hunter's valuation. And I don't see anything in the settlement contract that you're appointing me to that says there's a way that one must value the painting. And, Your Honor, you're correct that the settlement agreement doesn't speak to it. But the only – the legal mechanics of how the arbitrator allowed Dr. Hunter to rely on that – on the – this valuation was based on ignoring the merger clause and saying that my client had made a representation. Did the merger clause bind Dr. Hunter as to what he could rely upon when valuing the painting? I believe it – I believe it did, Your Honor, because the – Does it say when Andrei Del Sarto painted and what a good painter he was and how many paintings he's got on the market? Presumably all that went into Dr. Hunter's valuation, right? So, Your Honor, the – Now answer my question. The – Presumably all of those facts went into Dr. Hunter's valuation, correct? Dr. Hunter was entitled – Did you know – He was – Listen. The way this works –  Is that when we answer – ask a question, you answer the question. I am trying to answer the question, Your Honor. So that's a yes or no question. Presumably all these facts surrounding the context of who Andrei Del Sarto was, what kind of paintings he has, what kind of market price they fetched, all that would have been factored into Dr. Hunter's valuation. Is that correct or not? That's correct, Your Honor. Okay. And were any of those facts in the settlement agreement? Yes. They were? Yes. There was a stipulation as to authenticity and the date they – No. I listed a number of things that were not in that list. Right. Your Honor, the main issue is that this turned on condition because an old master's painting, the valuation of an old master's painting turns almost entirely on its condition. And that's why this is – that's the issue that's at the center of the case. Okay. And why wasn't it apparent to everybody what the condition was? It's because the painting was never produced. So the burden goes – it shifts against the party who's a breacher. And there's no question about the breach here. You're trying. Your Honor, the record at the arbitration was that Dr. – Mr. Simon, who was a joint expert on behalf of LOFA and the Peck parties, had looked at the painting and brought in an art conservator named Diane Modestini, and they both agreed that the paint – there were serious concerns about the condition of the painting, and they wanted to have it examined in the lab. And they told Gary Greenberg this. So the contention that – I mean, the arbitrator's finding that there was a promise of the condition was really contrary to the evidence. Now, I haven't – I haven't focused on that because I'm focusing on disregard of the contract provisions. Well, let me – All the provisions you're saying are disregarding the merger agreement at this point? That was the merger agreement, Your Honor. Your merger clause. Well, the problem – the problem is the merger agreement really wasn't highlighted during the arbitration. You were there. You know better than I do as to whether this point that you're making so vociferously now about the merger agreement was raised before the arbitration. And very often, you know, issues at trial disappear on appeal, and new issues pop up on appeal. Well, Your Honor, I'm glad you asked that question. It seems like you examined the agreement after the case was decided, and then you said, aha, we've got a merger provision here. Let's – let's concentrate on that on appeal. Your Honor, I'm glad you asked that question. That may happen in some situations, but in fact, in this case, it was in my pre-hearing brief, and it was something that happened in my papers, you will see, that when I was cross-examining Gary Greenberg about the merger clause and what it meant, the arbitrator interrupted me and asked the question himself, okay? And as to manifest disregard, he knew the merger agreement, and he said, if something – if a representation did not find its way into this contract, okay, you understand, Mr. Greenberg, that you can't rely on that. And he said yes. So this was very much front and center in court. Did that – did that limit what the expert, Dr. Hunter, could take into consideration in offering his evaluation, though? So the – Why would that find him? The contention of LOFA in that hearing and the basis of relying on that – that evaluation was that there had been a contractual representation in that settlement agreement as to the condition of the painting. That's not what Dr. Hunter said. That's what – that's what – He relied on the contractual representation? Yes. Yes, it is. Because the arbitrator suggested there was a contractual representation. So – so – Give me a page in the record where Dr. Hunter said he relied on a contractual representation. I will – I will give you that. That it was based on his interpretation of a contract. Yes. I will give you that. It's on – it's on page 236, A236 and – and 155. And I remember this very well because that – this was – this was the attempt – this was the redirect of – of – of Mr. – of Dr. Hunter. And he said that he was asked to assume that ACG had made a contractual promise that the condition report provided in connection with the settlement agreement was accurate. Now, there – there wasn't a condition report provided in connection with the settlement agreement. Hang on a second. I'm sorry. Where are you? On A236. I have A236. I have my notes. Transcript. What page? It's page 155, lines 6 through 9. Can I just ask you, though, this is the cross, right? This is the redirect.  Hadn't Dr. Hunter already provided his evaluation? He provided evaluation, but – And it was $15 million. The 15 – yes. Yes, Your Honor. And it was based on an assumption that it was a good condition, right? That's right. So I – I understand how you're saying this came up in redirect while they're trying to justify or defend his conclusions. But this doesn't say that his – okay. Well, go ahead. He said that he was asked to assume that the condition was good. And remember, the elephant in the room, Your Honor, is I haven't mentioned yet, the 2019 appraisal, the very same appraisal company and the very same appraiser appraised the same painting at one point. Well, it's not quite fair to say it's the very same appraiser. I mean, he – the appraiser was Habsburg, right, in 2019. And included at the end of the appraiser is that Dr. Hunter provided significant assistance and research. And that was clarified during the testimony about there had been a phone call in which the ownership or co-ownership of Benito and someone else possibly was discussed. So that was clarified and elucidated. So I think it's not accurate and not fair to describe it as being his own appraisal in 2019. It was the same company that he was a consultant to that provided the 2019 appraisal. Isn't that correct? Your Honor, you're absolutely correct as to what the testimony was about that. I think that it's – Isn't it correct that it was someone else who certified the 2019 appraiser? Another person certified it. But it was a person who went – the arbitrator asked the expert. He said, now that you see the 2019 appraisal, now that it's been presented to you, and he said, it seems to me that an extraordinary assumption about the condition of the painting you made may not be correct. Does that change your valuation of this painting? And he said it would have an impact on price. So the arbitrator asked that question to him. And Dr. Hunter admitted that it would have an impact on price. And that's the concern I have is that – But also, wasn't it fair to say also that there were a lot of other circumstances that would have an impact on price, such as whether the painting was going to be used as collateral or just be sold free and whether there were ownership issues and a number of other elements that go into the valuation of a painting? So, Your Honor, the condition is the most important single factor. How about authenticity? So authenticity was agreed. But that is – that's an important factor, right? It is an important factor. It is, Your Honor. Now, as to – All right. Let me just ask if any member of the panel has any further questions because we've kept you up considerably past your time. Okay. It looks like we don't. So why don't we hear back from you as a rebuttal? You've reserved two minutes. Why don't we hear from Attorney Holcomb? Thank you, Your Honors. Good morning, Your Honors. Nathan Holcomb for the appellees. The pet parties lost this arbitration, and they're asking for a do-over. They're asking for this court to revisit the arbitrator's rulings limiting discovery, the rulings limiting testimony at the hearing, and they're asking for the court to apply the law de novo to the arbitration record. That is not the standard for review of an arbitration award under the Federal Arbitration Act. I won't belabor the standards that apply to this court's review of an arbitration award because I know the panel is very familiar with those standards, but those standards control each and every issue that the appellants have raised before this court. I'll address each of those issues briefly. Of course, if the panel has any questions, I'll focus on the issues that the panel would most like me to focus on. So the price went from the appraisal just so I'm clear. The appraisal price was $15 million, and then the ultimate award was $7 million. I guess that's due to the waterfall provision? Correct. The formula that's in that? Correct. And that actually goes to the point of whether there was manifest disregard for the standard of expectation damages, as my colleague has argued. Now, what about the merger clause? Why — what's your reasoning for the fact that the merger clause was not applied here? So a few points. Mr. Peck has — Mr. Press, apologies — has correctly said the merger clause was briefly referenced in his pre-hearing brief. It was not referenced at all in his post-hearing brief. So it was not highlighted as an issue before the arbitrator. And the argument that we're hearing turns on my client, Mr. Greenberg's, responses to questions where he was asked, could you rely on a representation regarding the condition of the work? My client correctly has answered, no, in a context like a claim for breach of representation of a warranty in the agreement. That isn't the claim here. The issue is there were breaches of representations in the agreement, including that the sellers or the — that the Peck parties had the right to consign the work, that there were no competing claims to the work. Turns out they didn't have it. They breached. And the issue is, how are damages calculated? So under those circumstances where there was summary judgment that there was breach, an expert is given the task of calculating damages, is unable to examine the work, the expert relied on the condition reports that were provided to my clients that said the work is in fine and stable condition. It said what? I thought there were representations by Peck himself made earlier on as to the condition of the work. And that was — they're arguing that that couldn't be considered under the merger clause. But your preserver would say that, well, the merger clause didn't reach the appraiser. He was the party, and he was entitled to rely on anything that he knew about this, all the factors that might come into an appraisal. Correct. The merger clause does not limit what information an appraiser serving as a testifying expert in arbitration is allowed to take into account in arriving at an opinion on damages under the circumstances where he's not able to examine the work because the other side has breached and can't produce it to him. What do you make of your opponent's argument, and he refers to page 155 of the transcript, where he says, and I think he's suggesting that in this particular portion of the cross, the expert himself said that he was relying on, I think what he described as — assumptions that I guess are derived from the contract. When respondents make contractual promises like, et cetera, the various things, the witness says, yes, they underpinned my valuation for $15 million. I take it the reading there is that in that question-and-answer exchange, the witness was not saying he relied on factual representations, but he relied on what are described as contractual promises. If a witness were not relying on a factual representation but on a contractual promise covered by a contract that has a merger clause, do you think that changes anything if it weren't just sort of a stand-alone factual representation? So that redirect follows cross, where the expert was asked, if you assume that the condition was poor, would that affect your valuation? The expert truthfully answers, if I assume that the condition was poor, that would bear on the valuation. And then on redirect, he's asked, well, I want you to make legal assumptions. If, as a matter of law, you're entitled to assume that the work's authentic, that it's in good condition, then if you're entitled to make those assumptions, what's the opinion on valuation that follows from those assumptions? The basis of the assumption on authenticity is the representation in the contract. The basis for the assumption on the condition of the work is the precontractual representations. As you've noted, there was both a condition report provided. There were oral representations. I have a paragraph in the brief that summarizes the sources for all of those representations. But those are precontractual representations. And the arbitrator found that the expert was entitled to rely on those representations under the circumstances where he's providing an opinion on value, in circumstances where he can't have access to the work. And that's based on the principle. He cites this court's opinion in Process America, Inc., v. Synergy Holdings, LLC, that doubts are generally resolved against the party in breach. But still, I was a little concerned in the arbitrator's award that he says the task of the arbitrator is to determine the market value. And he calls it ironic that the expert was prevented from examining the property or the painting and then goes through representations that were made and treats them as binding that are not just what the expert heard, but what happened over the course of the litigation, as I understand it anyway. Statements that the painting is in fine and stable condition. The respondent's report says it's in good condition. Respondents at various times hiked the value of the painting when it was in their interest to do so. Pat concluded in the preliminary injunction hearing the painting was worth $10 million to $15 million. I mean, that's a judicial context. But still, there was a lot outside of Dr. Hunter's own valuation that he was looking at. To me, this felt like valuation by estoppel more than as a factual valuation matter. And because of the merger clause, I was concerned about whether that was running foul of the standard understanding of a contractual provision like the merger clause for the arbitrator to do this. Was this not too far for the arbitrator to go? The assumptions that the arbitrator held that the expert, Dr. Hunter, could rely upon were, you referred to the preliminary injunction hearing testimony. In addition to that, and I think the weight of the evidence that the arbitrator held the expert could rely upon, was what the PEC parties had represented to my client in the course of negotiating the settlement agreement, that the work is in good condition, that they provided the report to my client that said it was in good condition. And the arbitrator concluded that under these circumstances, where there has been a breach, where there cannot be an evaluation of the work firsthand by the expert, the expert is entitled to rely on assumptions based on representations made by the breaching party based on the principle that doubts are resolved against the breaching party. So in a way, they're estopped from relying on the merger clause to preclude the expert and the court's consideration of these extraneous representations of condition. I would agree that there is something akin to estoppel in the arbitrator's reasoning. I think the issue of the merger clause is separate. What the merger clause does is state that the contract between the parties is integrated and defined by the writing. The merger clause does not answer the question, where there is a breach, one party is wronged and owes money to the other side, and a tribunal is tasked with figuring out how much money that is. The merger clause doesn't determine every aspect of how that analysis is done. And here, the arbitrator, applying this court's precedent, not manifestly disregarding this court's precedent but explicitly citing it, determined that under those circumstances, the expert permissively relied on assumptions that were provided by the breaching party. That's great. That's very helpful. Thank you. All right. I don't think there are any further questions from the panel, so thank you very much, Mr. Holcomb. We have your argument. Mr. Press, you've reserved two minutes for rebuttal. Thank you, Your Honor. And we'll keep it tightly to two minutes. We kept you up a long time in the beginning. We appreciate that, but we'll keep it to two minutes. I appreciate the additional time, Your Honor's giving. So one thing I want to be clear on is the arbitrator said that he, the 2019 appraisal was not pertinent, okay, to his decision because of the alleged contractual representations. Okay. And it's very important because during the hearing itself, the arbitrator seemed to find the 2019 appraisal very credible and that the painting's condition actually wasn't good. And so I think the merger clause and reliance on the prior representations is critical to underpinning this decision that got the valuation completely wrong. And once again, to me, it's crystal clear on the record that when on cross-examination, Dr. Hunter acknowledged that the $15 million valuation wasn't correct, but he never came up with another valuation. And so when somebody says I'm wrong about the $15 million valuation, I can't say what it would be, but then he disavowed that valuation. And I don't think there's any colorable basis for an arbitrator to rely on a disavowed valuation. Well, the problem is you're up against the Federal Arbitration Act and you're up against the manifest disregard law. All of the deference is to the arbitrator, and he's allowed to make mistakes and not have the arbitration overturned. Here it all looks like this was part integral to the actual decision that was made, and maybe mistakes, maybe errors were made in the process, but that's what you bargain for when you sign up for arbitration. And, Your Honor, I'm certainly aware of the standard. I think in my view that the arbitrator, as the Court found in Weiss, that the arbitrator wasn't made noises about enforcing the contract, but really fundamentally did what he thought was fair. The contract itself. Correct me. I may be wrong on this. I thought the contract itself was silent. Itself, the writing was silent on the condition. Your Honor, the point, though, is that the representations made in that contract were heavily negotiated, okay? And my clients gave a representation of authenticity, but they expressly didn't provide representation on condition. And so the problem with this is the arbitrator basically found a representation that was not in the contract, that was not part of what was negotiated by the parties. Am I correct also that you retained Dr. Robert Simon to be your expert, but you didn't ask Dr. Simon to value the painting? You just used him to cross-examine and criticize Dr. Hunter's valuation. So you didn't proffer an alternative expert valuation that was contemporaneous. Is that correct? We didn't, Your Honor. And the reason why was because you may recall that prior, during the facts of the case itself, Dr. Simon, Robert Simon rather, was a jointly retained expert, and he found, he said that there were significant problems with condition, and he wanted to have it examined under a lab. And he said he wasn't able to provide an opinion on the valuation until he actually had had the painting studied in the lab setting. That's in testimony. So he wasn't able to, consistent with what he said before, he wasn't able to provide And you didn't proffer an alternative valuation. There was no way for us to do it. But the one person who did, the important part here is the one person who actually had their hands on this painting and saw the painting and valued it was another professional at Winston, Mr. von Hapsburg, who found that it was in poor condition. And it was, that has never been disputed, that the painting's actual condition is poor. And I think that what the fundamental miscarriage of justice in this case is that the valuation of this painting was assuming that the condition was good when it was essentially undisputed by everybody, including Dr. Hunter, that the condition of the painting was poor. All right. Thank you, Your Honors. No further questions. Thank you very much to both counsel. We appreciate your coming in for argument today, and we will take the case under advice.